IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JONATHAN HADNOTT, JESSIE HADNOTT, KEVIN HUNT, and BRANDELL BETTS, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, MICHAEL KELLY, MARC JAROCKI, and PATRICK GILMORE, <br><br> Defendants. | No. 07 C 6754 <br><br> JUDGE DAVID H. COAR |

**MEMORANDUM OPINION AND ORDER**

Before the court is the plaintiffs' motion to vacate Magistrate Judge Schenkier's October 23, 2008 order regarding communications plaintiffs' attorney may have had with her clients. For the following reasons, the motion is DENIED.

**I. BACKGROUND**

In their second amended complaint, the plaintiffs allege that on December 4, 2006, at approximately 4:00 p.m., Chicago police officers stopped plaintiff Jonathan Hadnott without cause or reasonable suspicion, searched his person, and arrested him without probable cause. (R.34, 2d Am. Comp. ¶¶8-9.) The plaintiffs further allege that the officers then drove Jonathan Hadnott to the home he owns at 7322 S. Green in Chicago (where plaintiffs Jessie Hadnott, Kevin Hunt, and Brandell Betts reside), detained the plaintiffs against their will, and searched the home without permission or legal cause. (*Id.* ¶¶ 10-12.)

The plaintiffs have named three officers who have a plausible connection to the alleged incident: The Chicago police department identified defendant Michael Kelly as an officer who

had obtained police database information about Hadnott on the date of the alleged incident, and defendants Marc Jarocki and Patrick Gilmore were identified as two officers assigned to the same vehicle as Kelly on that day.  All three officers, however, deny involvement in the alleged incident.  Thus, the identity of the officers remains an issue for trial.

The identity dispute complicates discovery, as was particularly evident in the parties' disagreement over the appropriate protocol for the officers' depositions.  The defendants, in particular, are concerned that a plaintiff's observation of a defendant at a deposition—a highly suggestive context—will taint the plaintiff's subsequent identification of the defendant in court.  The plaintiffs, meanwhile, do not want to abandon their rights to participate meaningfully in the prosecution of their case.

The parties asked Magistrate Judge Schenkier to resolve these competing interests prior to Kelly's deposition (which was to occur before August 21, 2008, the date of his military deployment abroad).  And so on August 12, 2008, Judge Schenkier offered a solution:  Without setting in stone the protocol for all subsequent depositions, he ruled that if the plaintiffs intended to attend Kelly's deposition they first would have to view a photographic array that included Kelly's picture (along with his height and weight) and indicate whether any of the individuals in the array had been involved in the alleged incident.  (R.85, Ex.A, Tr. 8/12/08 at 12-13, 20; R.65.)

In compliance with the court's order, the plaintiffs' attorney, Irene Dymkar, timely informed defendants' counsel that the plaintiffs intended to attend the deposition.  A photographic array was then prepared.  (R.111, Ex.A.)  On the day before the deposition, though, Attorney Dymkar told defendants' counsel that only plaintiff Jonathan Hadnott would attend.  Defense counsel responded that they understood Judge Schenkier's order to require that each

plaintiff view the photographic array before any plaintiff could attend the deposition. (R.111, Ex. B.)

To clarify Judge Schenkier's August 12 ruling, Attorney Dymkar and defendants' counsel participated in an impromptu telephonic hearing with Duty Magistrate Judge Geraldine Soat Brown on the day of the deposition, August 19, 2008. (R.85-3.) Judge Brown concluded that the intent of Judge Schenkier's August 12 ruling was to avoid exposing the plaintiffs to Officer Kelly's physical appearance. Allowing just one plaintiff to view the photographic array and attend the deposition would subvert that intent, said Judge Brown, because nothing would prevent the plaintiff from relaying a physical description of Kelly to the other plaintiffs. (R.85, Ex. B, Tr. 8/18/08 at 10-11.) Accordingly, Judge Brown ruled that the attorneys could either resume the deposition at a later date after each plaintiff had viewed the photo array, or take the deposition outside the presence of the plaintiffs. (*Id.* at 12.)

The parties elected to proceed with Kelly's deposition, and no plaintiffs attended. During the deposition, Attorney Dymkar asked Kelly specific questions about his own physical appearance, that of his codefendants, and that of the vehicles they may have been driving while on duty on the date of the alleged incident. Defendant Kelly's counsel did not instruct him not to answer the questions. But at various points during the deposition, defendants' counsel requested that Attorney Dymkar confirm that she would not disclose the elicited descriptions to her clients. She refused. Attorney Dymkar said only that she would comply with the court's orders. (R. 111, Ex. C, Kelly Dep. 72-73, 77-79, 148-50.) At the conclusion of the deposition, defendants' attorneys proposed a telephonic conference with Judge Brown to clarify whether Attorney Dymkar could discuss Kelly's descriptions with the plaintiffs. Attorney Dymkar refused to seek that clarification. (*Id.* at 150-51.)

The following day, August 20, 2008, defendants' counsel filed a joint motion to place under seal the identifying information Attorney Dymkar had elicited at the deposition, and to enter a protective order. (R.73.) On August 27, 20008, Judge Schenkier granted the motion. (R.85, Ex.C, Tr. 8/27/08, at 4-5.) The court noted that if Attorney Dymkar had shared Kelly's physical description with the plaintiffs it would "undermine the whole purpose" of both Judge Schenkier's order and Judge Brown's order that the plaintiffs view a photographic array before attending a deposition. (*Id.* at 3-4.) He also confirmed that Judge Brown's ruling would have been his as well. (*Id.* at 10.)

Judge Schenkier then asked Attorney Dymkar if she had disclosed Kelly's physical description of himself, the other officers, or their cars, to her clients. (*Id.* at 4.) Attorney Dymkar refused to answer the question, citing the attorney-client privilege. (*Id.*) She said only that she had not violated any court orders, in spirit or otherwise. (*Id.*) Judge Schenkier responded that, had Attorney Dymkar participated in a telephone conference with Judge Brown to clarify her obligations under the court's August 12 order, the attorney-client issue would not have arisen. (*Id.* at 5-7.) He then gave Attorney Dymkar two weeks to submit authority for her assertion of attorney-client privilege. (*Id.* at 8-9.)

On October 23, 2008, after considering submissions from both parties, Judge Schenkier ruled that the attorney-client privilege does not protect Attorney Dymkar's disclosure of whether she relayed to her clients the identifying information she discovered and elicited at Kelly's deposition. (R. 95, 10/23/08 Minute Entry; R.99, Ex.A., Tr. 10/23/08 at 8-10.) Judge Schenkier explained that the information was not a confidential communication from a client to an attorney, nor would its exposure reveal client confidences. (*Id.* at 8-10.)

Judge Schenkier also ruled that, if Attorney Dymkar did provide that information to her clients, it would violate both the August 12 and August 19 orders. (*Id.* at 7-8.) He explained that the purpose of both orders was to prevent any of the plaintiffs from seeing Kelly at the deposition before independently identifying him. (R.99, Ex. A., Tr. 10/23/08 at 6.) The intent of that order clearly would be subverted, said Judge Schenkier, if Attorney Dymkar could simply relay to her clients the descriptions Kelly provided. (*Id.* at 6-7.) Judge Schenkier was confident, too, that Judge Brown would have confirmed that understanding of the rulings had Attorney Dymkar consented to a telephonic conference after the deposition. (*Id.* at 7.)

Judge Schenkier then established the following procedures for the inquiry into Attorney Dymkar's communications with her clients: Denying the defendants' request for a hearing, he instead ordered that Attorney Dymkar file under seal a declaration, a copy of which she would provide to the defendants. (R.99, Ex. A., Tr. 10/23/08 at 10-11.) If Attorney Dymkar had discussed with her clients physical descriptions that she obtained at Kelly's deposition, she would have to (1) name the clients to whom she made the communications; (2) provide the dates the communications were made; (3) note the aspects of the physical descriptions she had communicated; and (4) note whether the communications were oral or in writing and, if the latter, attach a copy of the writing. (*Id.* at 11-12.) The court further ruled that, if Attorney Dymkar submitted a writing, any potentially privileged information therein—e.g., an analysis of what was said at the deposition, as opposed to mere recitation of what Kelly said—could be redacted from the copies served on the defendants, but Judge Schenkier would review *in camera* the unredacted version. (*Id.* at 11-12.) Additionally, Judge Schenkier ruled that the defendants could cross-examine the plaintiffs at their depositions regarding Attorney Dymkar's communications about physical descriptions elicited at Kelly's deposition. (*Id.* at 12.)

Finally, as a sanction, Judge Schenkier awarded to the defendants reasonable attorneys' fees and costs in connection with (1) their August 20 motion to place certain information under seal and for a protective order, (2) their in-court appearance on that motion; (3) their reply brief on that motion, and (4) their in-court appearance at the October 23 hearing. (R.95, 10/23/08 Minute Entry.)

The plaintiffs timely filed their objections to the October 23 order. (R.99.)

## II. STANDARD OF REVIEW

In reviewing timely objections to a magistrate judge's ruling on a non-dispositive matter, this court must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see* 28 U.S.C. §636(b)(1)(A). Clearly erroneous aspects of a magistrate judge's ruling are those that leave the court "with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997).

## III. ANALYSIS

The plaintiffs' objections to Magistrate Judge Schenkier's October 23 order raise the following issues: (1) whether Attorney Dymkar's communications to her clients of physically identifying information from defendant Kelly's deposition are protected by the attorney-client privilege; (2) whether such communications would violate the August 12 and August 19 orders; and (3) whether the sanction of attorneys' fees and costs is warranted. (R.99, Pl.'s Obj. ¶6.)

A. Applicability of the Attorney-Client Privilege

The plaintiffs, through Attorney Dymkar, argue that any statements she may have made to her clients relaying the descriptions she elicited at Kelly's deposition are protected by the attorney-client privilege. Accordingly, they argue that this court should vacate Judge

-6-

Schenkier's orders requiring Attorney Dymkar to disclose those communications and subjecting the plaintiffs to cross-examination regarding the communications. (R.99, Pl.'s Obj. ¶27.) The defendants respond that the inquiries authorized by Judge Schenkier's order would address only the fact of an attorney-client communication, not the substance of that communication, and that the attorney-client privilege is not implicated because Judge Schenkier's order addresses only statements made by Attorney Dymkar to her clients. (R.111, Resp. 6-7.)

The attorney-client privilege "protects confidential communications made between clients and their attorneys for the purpose of securing legal advice." *In re A Witness Before the Special Grand Jury 2000-2,* 288 F.3d 289, 291 (7th Cir. 2002). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981). But "because the privilege is in derogation of the search for the truth, it is construed narrowly." *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). And the party asserting a privilege bears the burden of establishing each of its elements. *Id.* at 1461-62.

The Seventh Circuit "has long embraced the articulation of the attorney-client privilege first set forth by Dean Wigmore . . . . [who] summarized the essential general principles governing the privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protect (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (quoting 8 John Henry Wigmore, Evidence in Trials at Common Law §2292 (John T. McNaughton rev. 1961)). The fifth element of Wigmore's formulation—that the communication be made *by the client*—is subject to exceptions: an attorney's statements to a client also are protected "where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client." *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000) (citations omitted).

    The court finds no error, legal or otherwise, in Judge Schenkier's rulings that Attorney Dymkar must inform the court of any statements she has made to her clients regarding the physical descriptions she saw and heard about at Kelly's deposition, and that the plaintiffs may be cross-examined regarding such communications. Simply put, candid responses to Judge Schenkier's narrow inquiries are not protected by the attorney-client privilege. First, the information requested does not involve confidential information Attorney Dymkar obtained from her clients, nor will it reveal any such confidential information. *See Rehling*, 207 F.3d at 1019. The inquiry is restricted to Attorney Dymkar's disclosure of identifying physical characteristics that she obtained at Kelly's deposition; any descriptions provided by the plaintiffs to their attorney, of course, remain protected—including any responses to Attorney Dymkar's revelations. Second, Judge Schenkier explicitly limited the inquiry to the fact and content of those descriptions; Attorney Dymkar's legal advice would remain protected, and anything she considered advice would not be disclosed to the defendants but would be reviewed *in camera* by the court. Given these well-crafted parameters, Attorney Dymkar's concern that her clients could be questioned about any conversations she had with them pertaining to the officers' identities is unfounded. The court is confident that, under Judge Schenkier's sound guidance,

the attorney-client relationship will be respected and the court's search for truth will not be hindered.

B.  Disclosure of the Information Under the Court's Orders

Attorney Dymkar argues that, if she revealed to her clients any descriptive information she obtained at Kelly's deposition, it would not violate either Judge Schenkier's August 12, 2008 order or Judge Brown's August 19, 2008 order.  (R.99, ¶¶21-22.)  Her theory is that, because the defendants did not seek a protective order in advance of the deposition, nor request that the testimony be sealed, they opened the door for Attorney Dymkar's disclosure of the physical descriptions Kelly provided during the deposition.  (*Id.* ¶¶25-26.)  And she notes that a particular physical characteristic of Kelly's had been placed on the record by defense counsel on August 19, 2008, and has since been discussed in motion papers—absolving her, she asserts, of any responsibility to conceal it from her clients.  (*Id.* ¶24.)  Defendants respond that Attorney Dymkar, an officer of the court, had a responsibility not to act against the court's intent, and that her refusal to clarify those orders suggests that she exploited the ambiguity in bad faith.  (Resp. 10.)  With respect to the physical characteristics that are part of the public record, defendants respond that the plaintiffs' potential exposure to that information does not alter Attorney Dymkar's obligation to adhere to the letter and intent of the court's orders.  (Resp. 12.)

An attorney must act in the best interests of her client, but she also has obligations as an officer of the court.  *See BEM I, LLC v. Anthropologie, Inc.,* 301 F.3d 548, 551 (7th Cir. 2002). Among those obligations is a duty not to "engage in conduct that is prejudicial to the administration of justice." L.R. 83.58.4(a)(5).  That means abiding by the rules set by the court, including the spirit of those rules.  *See, e.g., Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 422 n.9 (7th Cir. 1998).  As the Fourth Circuit has explained, "[t]he system can provide no harbor for

clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993).

The court agrees with the plaintiffs that the August 12 and August 19 orders did not say, literally, that Attorney Dymkar could not share with her clients the descriptive information she elicited from Kelly during his deposition. Those orders established protocols for the plaintiffs' attendance at Kelly's deposition and did not include explicit demands of Attorney Dymkar. Nevertheless, the spirit and intent of the orders was clearly communicated: The court did not want any of the plaintiffs to be exposed to identifying information about the named defendants before each of them had viewed a photographic array. It should have been obvious to Attorney Dymkar, then, that providing such information to her clients would contravene the court's intent.

If Attorney Dymkar was uncertain about her obligations to the court, moreover, she should have either sought clarification from Duty Magistrate Judge Brown or refrained from sharing the information with her clients until Judge Schenkier provided that clarification. Simply proceeding with the challenged conduct, absent confirmation from the court that it would be appropriate, was not an option Attorney Dymkar could choose in good faith. For this reason, the court rejects Attorney Dymkar's contention that she cannot be found to have violated a court order based on the "speculati[on]" that, had she consented to a clarification of the orders, Judge Brown would have confirmed that Attorney Dymkar could not reveal that information to her clients. (*Id.* ¶23.) Under other circumstances, the court might afford the attorney the benefit of the doubt. But because Attorney Dymkar refused to clarify her obligations to the court, she risked this very result.

Even aside from Attorney Dymkar's obligations to the court, it also should have been clear that proceeding with the challenged conduct would not be in her clients' best interests. A plaintiff's exposure to the information could very well taint his subsequent identification of a defendant—a result that would surely weaken the plaintiff's case. And, as Attorney Dymkar herself acknowledges, she now could become a witness against her clients. Indeed, if Attorney Dymkar did in fact "insert herself" into this case, then she may very well be disqualified as plaintiffs' attorney. Such would be the result of her own misconduct. An attorney's desire to win can be a powerful motivation for vigorous advocacy; when it blinds the attorney to her ethical obligations, however, the client always loses.

### C. The Sanction of Attorneys' Fees and Costs

As a sanction, Judge Schenkier awarded to defendants reasonable attorneys' fees and costs. Although Judge Schenkier assessed that sanction based on Attorney Dymkar's conduct, neither his oral rulings nor his written order states who would bear those expenses—the plaintiffs or Attorney Dymkar. The plaintiffs, through Attorney Dymkar, suggest that the costs have been imposed on them. (R.99 ¶6f.) Defendants, however, believe Judge Schenkier clearly intended that the sanction be against Attorney Dymkar personally, given her refusal to clarify her obligations under the court's orders at the end of Kelly's deposition. (R.111 at 13-14.)

A district court has inherent authority to sanction conduct that abuses the judicial process. *Montano v. City of Chi.*, 535 F.3d 558, 563 (7th Cir. 2008) (internal citations omitted). The sanction imposed should be proportionate to the gravity of the offense. *Id.* Under 28 U.S.C. § 1927, moreover, the court is authorized to sanction an attorney personally: "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred

because of such conduct." 28 U.S.C. § 1927.  "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006) (quotation marks and citations omitted).

This court agrees with the defendants that the costs and delays were not caused by the plaintiffs themselves but by Attorney Dymkar.  The plaintiffs' only role, according to Attorney Dymkar, has been to demand that she not abandon the protection of the attorney-client privilege.  But as Judge Schenkier noted, the attorney-client privilege issue (which the court does not believe was raised in bad faith) only arose because of Attorney Dymkar's unreasonable and vexatious conduct during and at the conclusion of Kelly's deposition.  The expenses covered by Judge Schenkier's order all could have been avoided had Attorney Dymkar simply agreed to a telephonic conference with Duty Magistrate Judge Brown to clarify her obligations under the court's rulings.

Because there is no basis to conclude that the plaintiffs themselves were responsible for those additional costs, it would clearly be erroneous to assess those costs against the plaintiffs.  And though the court is confident that Judge Schenkier did not intend to impose those costs on the plaintiffs, rather than Attorney Dymkar, the court on its own motion will modify that aspect of Magistrate Judge Schenkier's order to reflect unambiguously that understanding.

## IV.  CONCLUSION

Accordingly, this court DENIES the plaintiffs' motion to vacate Magistrate Judge Schenkier's October 23, 2008 order.  On its own motion, the court MODIFIES that order to reflect that the sanction of reasonable costs and fees is against Attorney Dymkar personally.

Enter:

-13-

        /s/ David H. Coar

        David H. Coar

        United States District Judge


Dated: **February 24, 2009**